35 So.3d 524 (2009)
Floyd ROBINSON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2007-KA-02202-COA.
Court of Appeals of Mississippi.
June 2, 2009.
Rehearing Denied November 17, 2009.
*525 Leslie S. Lee, Justin Taylor Cook, Glenn S. Swartzfager, Jackson, Latisha Nicole Clinkscales, attorneys for appellant.
Office of the Attorney General by Laura Hogan Tedder, attorney for appellee.
EN BANC.
ROBERTS, J., for the Court.
¶ 1. A jury sitting before the Oktibbeha County Circuit Court found Floyd Robinson guilty of murdering his on-again, off-again girlfriend, Bridgette Moore. The circuit court sentenced Robinson to life imprisonment in the custody of the Mississippi Department of Corrections. Aggrieved, Robinson appeals. Finding no error, we affirm.

*526 FACTS AND PROCEDURAL HISTORY
¶ 2. On November 30, 2005, a woman went to the Oktibbeha County Jail and asked Deputy Sheriff Shannon Williams to go to a house and check on her friend, Bridgette. Deputy Williams complied and went to Bridgette's house in Starkville, Mississippi, where he found Bridgette's lifeless body. An autopsy later confirmed that Bridgette had died due to a single gunshot that traveled through her spleen, her stomach, and lodged in her heart.
¶ 3. Officers from the Starkville Police Department searched the crime scene and found a brown paper bag, a black comb, and an unfired .25 caliber shell casing. Officers also found blood on a cinder block that supported the steps to Bridgette's house, blood on the third step to the house, and two broken acrylic fingernails. Authorities focused their investigation on Bridgette's boyfriend, Robinson.
¶ 4. Robinson was arrested at his home. During a subsequent interrogation, Robinson signed a statement indicating that he and Bridgette struggled over a pistol and that the pistol discharged during the struggle. That is, Robinson claimed that Bridgette's death was an accident that happened during an altercation. Dr. Steven Hayne testified that the fatal gunshot entered Bridgette's body through her left side, traveled from left to right and upward at a thirty to thirty-five degree angle. The bullet went between two of Bridgette's ribs, through Bridgette's spleen, stomach, liver, heart, and lung. The bullet came to rest in Bridgette's right chest cavity. According to Dr. Hayne, the bullet was fired from approximately twelve to eighteen inches from Bridgette's body. Robinson testified that after Bridgette was shot, she sat on the steps to her front door, and they had a conversation. However, Dr. Hayne testified that Bridgette would have lost consciousness in three to fifteen seconds after she was shot. Additional facts and procedural history will be discussed in greater detail as necessary. Suffice it to say, Robinson was indicted, tried, and convicted of murder. After an unsuccessful post-trial motion for a judgment notwithstanding the verdict, Robinson appeals.

ANALYSIS

I. ROBINSON'S FIFTH AMENDMENT RIGHTS
¶ 5. Robinson was interrogated after he was arrested. That interrogation was preserved in the form of a DVD. At trial, the circuit court allowed the prosecution to play the DVD recording of that interrogation before the jury. Robinson takes the position that the circuit court erred because he invoked his right to have an attorney present, but the interrogating officers ignored his request. Because Robinson did not raise this issue at trial, he is forced to argue that the circuit court's decision constituted plain error.
¶ 6. "As a general rule, constitutional questions not asserted at the trial level are deemed waived." Williams v. State, 971 So.2d 581, 590(¶ 29) (Miss.2007) (holding that an appellant's claim that he was questioned before he was informed of his Miranda rights was procedurally barred when raised for the first time on appeal). Accordingly, this issue is procedurally barred.

II. PRIOR-BAD-ACTS EVIDENCE
¶ 7. In his second issue, Robinson again takes exception to the prosecution's use of the DVD recording of his confession. Unlike his first issue, Robinson is not required to travel under a plain-error theory. When the prosecution attempted to introduce the DVD recording of Robinson's interrogation into evidence, Robinson's *527 attorney objected and argued that it was inadmissible because during the interrogation, a law enforcement officer confronted Robinson with a report, dated sometime after an alleged incident on May 24, 2003, from a law enforcement officer identified only as "Officer Williams." Officer Williams's report indicated that Marilyn McKinney gave a statement and reported that Robinson threatened to kill her and that he put a gun to her head, pushed her, kicked her, and pulled out her hair. Robinson's attorney reasoned that the jury should not be permitted to hear that portion of the interrogation because it tended to persuade the jury that, having been violent two years earlier with one romantic interest, Marilyn, Robinson was more likely to have behaved similarly with Bridgette, another romantic interest and the victim in this case.
¶ 8. The prosecution argued that the DVD recording was admissible because it contained evidence that Robinson and Bridgette had an increasingly violent relationship that culminated in her death. The circuit court overruled Robinson's objection. According to the circuit court, "[t]he completeness of the issue that I have, that's what they're doing is interrogating concerning a homicide. That is different than eliciting evidence of a prior crime or criminal act. The objection and motion to suppress on that basis is overruled." Robinson appeals and claims the circuit court committed reversible error.
¶ 9. As we review this issue, we are mindful that the circuit court judge "enjoys a considerable amount of discretion as to the relevancy and admissibility of evidence." Shearer v. State, 423 So.2d 824, 826 (Miss.1982). We will not reverse the circuit court judge unless he abused his discretion and caused Robinson to experience prejudice. Id.
¶ 10. Pursuant to Mississippi Rule of Evidence 404(b):
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
The Mississippi Supreme Court has held that Rule 404(b) "exists to prevent the State from suggesting that, since a defendant has committed other crimes previously, the probability is greater that he is also guilty of the offense for which he is presently charged." Jasper v. State, 759 So.2d 1136, 1141(¶ 23) (Miss.1999). "[E]ven when other-crimes evidence is admissible under M.R.E. 404(b), it must pass through the `ultimate filter' of M.R.E. 403." Id. at (¶ 24). Additionally, "when other-crimes evidence is admitted under M.R.E. 404(b) a limiting instruction is required[.]" Id.
¶ 11. In the event that "404(b) evidence is offered and there was an objection which is overruled, the objection shall be deemed an invocation of the right to [an] M.R.E. 403 balancing analysis and a limiting instruction." Id. "The court shall conduct [a Rule 403 balancing test] and, if the evidence passes that hurdle, give a limiting instruction unless the party objecting to the evidence objects to giving the limiting instruction." Id.
¶ 12. On the DVD admitted into evidence and played for multiple hours before the jury, the interrogating officer read Officer Williams's report to Robinson and that report stated as follows:
On the above date at approximately 20:52 hours, I, Officer Williams, took a report from Ms. McKinney concerning her boyfriend. It says ... Floyd Robinson... constantly keeps threatening *528 her about killing her. He's always talking to her [about] ... taking her to the middle of nowhere, putting a gun to her head and throat and telling her what he would do to her. On [May 24, 2003] ... he took her to his house and started washing dishes and when she told him she was going home, he started going ballistic and started to push, kick, and pull out her hair. He pulled a gun on her then[,] and once he settled down, he just told her to leave. She left and went home and then called the police.
After the interrogating officer read the report to Robinson, the interrogating officer commented, "[m]y goodness. You got two women saying they felt like you were going to kill them at one point in time two separate times."
¶ 13. At trial, the prosecution argued that this information was admissible pursuant to this Court's decision in Moss v. State, 727 So.2d 720 (Miss.Ct.App.1998). The facts in Moss are distinctly different from the facts in the present case. In Moss, the prosecution presented evidence that the defendant abused his wife prior to killing her. Id. at 724-25(¶ 17). That evidence was admissible to demonstrate a continuing pattern of violence against the victim that ultimately culminated in the victim's death. Id. at 725(¶ 19). See also Marbra v. State, 904 So.2d 1169, 1176(¶ 23) (Miss.Ct.App.2004). In the case presently before us, the challenged portion of the DVD at issue was that Robinson had previously been violent with Marilyn, rather than Bridgette. That evidence does not tend to demonstrate a continuing or escalating pattern of violence against Bridgette. Instead, it tends to persuade the jury that, because Robinson was violent with Marilyn on May 24, 2003, he was more likely to have been violent with Bridgette on November 30, 2005, andby extensionhe was more likely to have been guilty of the allegations against him. Accordingly, we find that the circuit court erred when it allowed the prosecution to submit that evidence to the jury. Be that as it may, the issue now becomes whether Robinson experienced prejudice as a result. Shearer, 423 So.2d at 826.
¶ 14. Viewed in light of Robinson's own testimony during direct examination, we must conclude that the error is harmless. Robinson testified that Bridgette confronted him with a pistol, that he grabbed the pistol in self-defense, and that the pistol discharged accidentally during their struggle. According to Robinson, Bridgette stated that she had been shot. Robinson testified that Bridgette did not appear to be injured and that they talked for a brief moment. Robinson said he then told Bridgette that he was going to leave because he was on probation. Robinson's own attorney then asked Robinson to elaborate on his prior convictions that led to his being on probation. Robinson responded and testified that he had prior domestic violence convictions for abusing Bridgette and Marilyn. Because Robinson testified as to his prior conviction for domestic violence against Marilyn, and used that prior conviction as his justification for leaving Bridgette's house after Bridgette was shot, we find that Robinson did not experience any prejudice based on the revelation during the interrogation that he had a prior conviction for domestic assault against Marilyn. Accordingly, although we find that the circuit court erred, based on Robinson's later testimony, we find that the error was rendered harmless.
¶ 15. The dissent argues that this logic is "syllogistically faulty circular reasoning." With due respect for the dissent and its opinion of our logical reasoning, we disagree. Robinson was indicted for the premeditated murder of his girlfriend, Bridgette. Robinson's defense was based *529 on the premise that the homicide was excusable due to accident and misfortune as set forth in Mississippi Code Annotated section 97-3-17 (Rev.2006). Stated differently, Robinson claimed the pistol accidentally discharged during a domestic quarrel with Bridgette and that Bridgette's death occurred either while he was "doing a lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent" or while he was acting "in the heat of passion, upon any sudden and sufficient provocation." Miss.Code Ann. § 97-3-17(a) and (b). To make such a claim of excusable homicide credible, Robinson had to convince the jury that his flight from the scene, with the weapon, was logical. Reasonable jurors could conclude that Robinson's unexplained flight from the scene of Bridgette's shooting, whom he professed to love, without calling for assistance is incongruent with a claim of accident. It is apparent Robinson interjected on his status as a prior convicted domestic-violence offender on probation, which logically prohibited him from possessing a weapon or being present at Bridgette's home, as a strategic trial decision to attempt to explain his otherwise unexplainable flight. Mississippi Rule of Evidence 103(a) instructs that a trial court's error in admitting otherwise inadmissible evidence or excluding otherwise admissible evidence is not reversible error unless a substantial right of a party is affected. Under the particular facts of this case, we fail to see how this error by the trial court was anything but harmless.

III. CONFRONTATION CLAUSE
¶ 16. Robinson's next assignment of error also involves the police report that was read during Robinson's interrogation. As previously mentioned, Marilyn gave a statement to Officer Williams, and Officer Williams's report was read to Robinson during Robinson's interrogation. Robinson claims the circuit court violated his right to confront witnesses against him when it allowed the prosecution to play the DVD recording of the interrogation. Robinson argues that, because he never had an opportunity to cross-examine Marilyn or Officer Williams, when the circuit court allowed that portion of the DVD to be played before the jury, the circuit court infringed upon his right to confront adverse witnesses. However, Robinson did not object to the DVD interrogation on the basis that he never had the opportunity to cross-examine Marilyn or Officer Williams. Accordingly, this issue is procedurally barred. Williams, 971 So.2d at 590(¶ 29).

IV. IMPEACHMENT WITH PRIOR CONVICTIONS
¶ 17. Robinson claims the prosecution improperly cross-examined him about his prior convictions. According to Robinson, the prosecution's questions about his prior convictions for domestic assault were prohibited by Mississippi Rule of Evidence 609. Robinson admits that his attorney did not object to the questions that he now takes issue with on appeal. However, Robinson claims that the prosecution's cross-examination amounts to plain error. We disagree. This Court will not rule on an issue that was not first presented to the trial court. Williams, 971 So.2d at 590(¶ 29). Due to a lack of a contemporaneous objection, this issue is procedurally barred.

V. SELF-DEFENSE INSTRUCTION
¶ 18. Robinson's proposed jury instruction designated as instruction D1(a) was a self-defense instruction. The circuit court declined to grant the instruction. According to Robinson, the circuit court committed reversible error in refusing the instruction.
*530 ¶ 19. The Mississippi Supreme Court has described the appropriate standard of review as follows:
When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed. Similarly, this Court has stated that in determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.
Smith v. State, 835 So.2d 927, 934(¶ 23) (Miss.2002) (internal citations and quotations omitted).
¶ 20. Robinson did not present any evidence that he shot Bridgette in self-defense. The evidence indicated that Bridgette aimed a pistol at Robinson, that Robinson grabbed the pistol in self-defense, and that the pistol then discharged accidentally. Consequently, Robinson was not entitled to a self-defense instruction for shooting Bridgette.

VI. DEFINITION OF REASONABLE DOUBT
¶ 21. In this issue, Robinson claims the circuit court allowed the prosecution to define reasonable doubt during the prosecution's closing argument. Robinson's theory stems from the following statement:
Let me tell you what this reasonable doubt-let my [sic] quantify that for you. If you go to bed at night and you wake up in the morning and there's snow all over the ground, you can suppose a number of things. You can suppose a bunch of Eskimos got a big tractor and they came down here in a trailer, and they shoveled snow on your front yard or that the Army brought in a C-130 and dumped snow out as they flew over your house, but you don't do that because it's not reasonable. It's ludicrous. And so you say it snowed last night. That's what this reasonable doubt thing is all about, Ladies and Gentlemen. That's what it's about. You weren't there to see the snow. You weren't there to see this woman killed. But the question is was it shoveled out or was it dumped out or did it actually snow that night? That's the question.
Robinson concedes that he must travel under a plain-error theory, because his attorney did not object to the statement at issue.
¶ 22. We decline to review this issue for plain error. Our supreme court has held that "[i]f no contemporaneous objection is made, the error, if any, is waived." Slaughter v. State, 815 So.2d 1122, 1131(¶ 47) (Miss.2002). We are under no obligation to review an assignment of error when an objection was not made or when an objection was made untimely. Id.

VII. CUMULATIVE ERROR
¶ 23. In his final issue, Robinson claims the cumulative effect of the errors at trial requires that this Court reverse the judgment of conviction and sentence. Although we found harmless error in Issue II, we have found no other errors. It follows that there can be no cumulative effect of errors that do not exist. As such, we find no merit to this issue.
¶ 24. THE JUDGMENT OF THE OKTIBBEHA COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS *531 AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO OKTIBBEHA COUNTY.
LEE AND MYERS, P.JJ., GRIFFIS AND CARLTON, JJ., CONCUR. KING, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, BARNES AND ISHEE, JJ. MAXWELL, J., NOT PARTICIPATING.
KING, C.J., Dissenting.
¶ 25. The majority finds that the trial court committed error in allowing into evidence that portion of Floyd Robinson's recorded interrogation which discussed his involvement in another crime substantially similar to that for which he was being tried. Having found this to be error, the majority proceeds to minimize it by saying Robinson's later mention of the same matter transformed it into harmless error. Believing the majority to be in error, I dissent.
¶ 26. In order to understand why I believe the majority is wrong, it is necessary to first know precisely what was said in the interrogation and second to place Robinson's trial testimony into the proper prospective.
¶ 27. During Robinson's interrogation, the detective asked him about two prior allegations of violence against girlfriends, one of whom was the murder victim in this case. The relevant portion of that interrogation is transcribed as follows:
Detective 1: I want to read something, okay. This is the West Point Police Department report that Bridgette Moore filed on April-on the 16th of April, 2004 at 00:11.
I, PFC Everette Cook, was dispatched to 1615 Mayhew Street in reference to a fight. Upon arrival I spoke with a Ms. Bridgette Moore. She advised that her boyfriend, Floyd Robinson, had beat her with his fist in her face and upper body. She also advised that he choked her and she thought he was trying to kill her. She advised that she got away by opening her truck door and running to his mother's house. She then called police.
Floyd was gone on my arrival. Bridgette came to the police department and signed an affidavit on Floyd for simple domestic violence.
Detective 1: Now, I want you to let me read this other one to you, too. Let me read this one to you, this is from of all people the other woman you have been talking about.
On the above date at approximately 20:52 hours I, Officer Williams, took a report from Mrs. McKinney concerning her boyfriend. It said Mrs. m-r-s McKinney concerning her boyfriend, Floyd Robinson, who constantly keeps threatening her about killing her. He's always talking to her in the middle of nowhere-taking her to the middle of, no I'm sorry he is always taking her in the middle of nowhere putting a gun to her head and throat and telling her what he would do to her. On the last evening 5-24-03 at approximately 16:30 to 17:00 hours, he took her to his house and started washing dishes. And when she told him that she was going home, he went ballistic, and started to push, kick and pull out her hair. He pulled a gun on her then, and once he settled down he just told her to leave. She left and went home and then called the police.
Detective 1: My goodness.
Floyd: That's a lie, and I know that's a lie.
Detective 1: Okay, you've got two women saying they felt like you were going to kill them at one point or time. Two separate women.
Floyd: What would I want to do that

*532 Detective 1: Do you not do a good job of managing them? Or what, you don't know how to talk to them? What happens?
Floyd: I don't have no problem with no women.
Detective 1: Excuse me
Floyd: A woman.
Detective 1: They have a problems with you, then right? You may not have a problem with them.
Floyd: I talk to a lot of ladies.
Detective 1: Well, we are talking about the two, that you
Floyd: It don't get that serious with me.
Detective 1: I'm sorry, cause, we are talking about the two that you have been dealing with.
Floyd: Okay.
Detective 1: You been dealing with Mrs. Moore.
Floyd: Um-hum.
Detective 1: And she, you know you said that you didn't have these incidents in West Point. I got two different women saying you know, saying you are doing these things to them. What do you say to them? What happened in that inexplain to meexplain what happened. Firsttell us what happened with Mrs. McKinney? She said you were washing dishes. She said she was going home and you go ballistic. You take her to the middle of nowhere, you pull a gun on her, threaten her.
Detective 1: Now, here's what I think, here's what I think happened.
Detective 2: This sounds crazy, man.
Floyd: I'm likea woman gonna tell you anythingthey go over there and tell you anything, they are going to say anything.
Detective 2: This is true, this is true. Someone made mention of a gun.
Floyd: Huh?
Detective 2: Somebody made mention of a gun that they got from you last year. Did you have a gun?
Floyd: Last year?
Detective 1: 2003.
Floyd: That was 2003.
Detective 1: Mrs. McKinney.
Detective 2: Where did you get a gun?
Floyd: I didn't have no gun.
Detective 1: Who was she married to?
Floyd: Uh-huh, some fellow.
Detective 1: So you were seeing her when she was married ?
Floyd: Uh-huh.
Detective 1: So you weren't truthful when I asked you?
Floyd: She was going through her divorce.
Detective 1: Okay, but she was married?
Floyd: Her and her husband had broken up about a year or so.
Detective 1: Mrsthey were going through a divorce, they weren't divorced.
¶ 28. The foregoing information was placed before the jury as a part of the prosecution's case-in-chief, well prior to any testimony from Robinson. Once the prosecution introduced this admittedly prejudicial material as part of its case-in-chief, Robinson sought to minimize the prejudicial effect of this improper testimony by offering an explanation. That explanation is found in the testimony of Robinson which follows:
Q. What do you mean by you "B"?
A. My bitch. And I said, oh, Lord, here we go. I said, well, we ain't fixing to start all this. She said no, that's where you were. That's why you really didn't want to come over here because you just want to be with her. In my *533 mind I said, yeah, I did, but I said, wellwe just kept on talking. I said, well, I don't know. You don't hear me complaining about you with a man or nothing. Why you keep hounding me down. I said I'm not bothering you. I said why.
When I got upI said, I'm fixing to get ready to out. I didn't come over for this here. I said I'm going to get ready to go. When I got up, she hit me in my back. And she went and grabbed the phone. I said, oh, Lord, here we go with the poliwith the phone again. I said go on and call the police. I said, well, I'm gone.
I was leaving the houseI went and put my clothes on and leaving the house. When I opened the door to leave and I said so I left my keys. Let me go back and get my keys. I turned around to get my keys and I was getting my keys and I looked up and she had the gun. I said what you doing? And she, well, you going over to be with that bitch, ain't you? I said this don't make no sense.
I saidand she got up close to me. That's when I grabbed her hand, and we started wrestling with the gun. And we fell outside the house. And we fell outside, and that's when the gun went off. And I said see there, this don't make no sense. I saidand really I thought I was shot, and she said she thought she was shot. And I said, Bridgette, this don't make no sense, and I walked her back up to the steps. And she told me, said, she was kind of tired. I said, Bridge, this don't make no sense. I said, I'm fixing to go. I seen the gun. I grabbed the gun. Said I'm fixing to go. I You know, the police come around here. I'm already on probation. I said I'm fixing to go and I left. And I said I'll call you back.
When I got home, I tried to call her back. I called, and I didn't get her answer. It was busy. And after that, I said, well, I'm going to bed. She probably got the police over there. And she mad and ain't going to answer the phone. I said, well, I'm going to bed and get me some sleep so I can go to work. I got up that morning and went called again. I said the phone still busy. I said, well, she still mad with me.
I said, well, and I got in my car. It was about ten minutes after six that morning. And I said, let me warm this car up 'cause it'd been cutting off on me. I said, well, let me call again. I said no. We ain't going to worry about it. I'm going to go on and go to work.
I started driving to work, and my car was cutting off on me. And I called my boss and told him, I said, I'm probably going to be little late. I'm trying to get my car fixed. My car keep cutting off on me. I'm out here on the bypass and it's cutting up. I have to sitlet it sit for awhile and then it will start back up. And he said okay. He said, just come on in when you get a chance, and I said all right.
I got the carwent it finallyI said, well, I'm going to try to take it over to Mr. Logan. I'm getting a little late now. I said, I'll get it over here. I went over there, and he wasn't there. And I said, well, I said, okay, I'll just check another time. I'll try to do it again. I said let me try to go over to Bridgette's and see how she doing, see if she's still mad at me.
I went over to her house, and I went up there and drove up to the house and come out and walked out to the house. And the dog started to run (inaudible) like that. I said, you know who this is. And I said, well, let me knock on the door. I said she might not even open it.
I knocked on the door and I didn't get no answer. I said let me see is it *534 locked, and I twisted the knob. It was open and then that's when I saw her. And I said, uh-oh. I thought, man. And just like that and I said, well, I closed the door back. And I said, oh, Lord. And just like that. And I left. I said oh, man, I got to go tell my father. Let him know. This ain'thuh-uh.
And I got up to myI sat atI said I'm going to take my life this here. Them folks going to think I did this here to her. I said, Lord, I feel like she dead. Folks going to think I did it to her. And I said I'm already only probation; ain't got no business over there.
And I went out in the county. I was going to drink some beers and stuff to get my nerve up, and I put the gun to my head and pulled the trigger, and it did not shoot. And I said, well. I throwed the gun down in the water. I said, well, I'll go and get a gun. That's when I went to my father's house and got his and tried to do theI was going to do the same thing.
When I left my father's house and I got ran off in the ditch, I pulled the trigger on it, and it didn't shoot still. And I said what's wrong? And I point the gun down in the floorboard and it shot. And my father told me, son, it's not worth it. Ain't no sense in you taking your life. And I thought about it and I said, well, yeah. And I said, Lord, I don't know. These folks going to think I done did something. And I said, well.
I went on home. And I don't know how I got home at that point, I really don't, because I had been drinking. And when I did make it home, the only thingit might have been about 1:30 orabout 1:30 or something, two I think. And I went in the house and I sat there and I-next thing I know I wasit was night, and I said, well, let me lay down and get me a little sleep. And I laid down. I said, well, I said, I'm tired. And I laid down and got me some sleep.
And the next thing I know, I said, I heard a shot. I said, what the world is this going on. I thought somebody shooting. And I said, I smell some gas or something. And I said, this is down here. So I go up here and II was upstairs, and I opened my window and went outside. And they said it's the police. And I said, the police? I said, oh, man.
And then they ran on the opposite side of the house. I said, no, I'm on this side over here. And they came back over there and said come down. I got halfway down out of thein the tree, and they dragged me down to the ground. And they said we're arresting you for the murder of Bridgette Moore. And I said what? And then I got in the car and I asked the officer, I said, sir, how long y'all been out there? He said, man we been out there ever sincehe said, it's been about five hours. I said
Q. Let me stop you right there. I want to go back because you've been going on for quite a while and I want to
A. Sorry.
Q. No. No. No. I want to clarify some things that you mentioned in your statement. You said that you were already on probation. Why were you on probation?
A. It was because Bridgette andit was for Bridgette Marilyn McKinney.
Q. When you say for Bridgette and for Marilyn, what do you mean?
A. It was like for the domestic violence situation.
Q. Had you been found guilty of domestic violence?
A. Well, I pled guilty to it. And only reason I pled guilty it because I had just started working at Weyerhaeuser. And I said, well, I said, since I can't take off work to be coming back to court, I said, *535 I'll go ahead and plead guilty and pay the fine and be through with it. That's what I thought because I asked the lady working at the desk at the police department in West Point. She told me, said, that's the best thing to
BY MR. ALLGOOD: If your Honor please, I'm going to object to the continual hearsay.
BY THE COURT: Sustained.
BY MS. CLINKSCALES: (Continuing)
Q. Floyd, did you ever go to trial on any of the domestic violence charges that were filed against you?
A. No, I didn't.
Q. Did any of the accusers ever appear with you and a judge on any of the charges of domestic violence?
A. No, they didn't.
¶ 29. A careful reading of the record reveals that Robinson did not simply and carelessly offer evidence of prior bad acts attributed to him. Instead, Robinson attempted to blunt the prejudicial impact of the prosecution's improper prior-bad-acts evidence by offering an explanation for those events. It is Robinson's efforts at blunting the prejudicial effect of the improper prior-bad-acts testimony that the majority now claims turns the admission of that improper evidence into harmless error. Such a claim can only be the result of syllogistically faulty circular reasoning.
¶ 30. The prosecution's prior-bad-acts evidence was admitted prior to any testimony from Robinson. The damage from this improper prior-bad-acts evidence was completed prior to any testimony from Robinson. The testimony by Robinson as to prior bad acts was presented in an effort to place into perspective the improper prior-bad-acts evidence that was previously introduced by the prosecution. Because the damage was done before Robinson's attempt at mitigation, I would reverse and remand for a new trial.
¶ 31. In an apparent effort to camouflage its syllogistically faulty circular reasoning, the majority seeks to place the responsibility for the admission of the improper prior-bad-acts evidence upon Robinson by saying that: "Robinson's defense was based on the premise that the homicide was excusable due to accident and misfortune as set forth in Mississippi Code Annotated section 97-3-17 (Rev.2006)." "It is apparent Robinson interjected his status as a prior convicted domestic violence offender on probationlogically prohibited from possession of a weapon or from being present at Bridgette's home-as a strategic trial decision to attempt to explain his otherwise unexplainable flight."
¶ 32. The fallacy in the majority's attempt at blaming Robinson is simple and straight forward. Robinson did not present any defense until after the State had rested its case in chief. The improper prior-bad-acts evidence was introduced by the State in its case-in-chief. The State's sole purpose in introducing this improper prior-bad-acts evidence was to prove that Robinson killed Bridgette. Before Robinson uttered the first word in his defense, the State had introduced the improper prior-bad-acts evidence, and the damage had been done. Contrary to the opinion of the majority, once the damage has been done, it cannot be undone. It especially cannot be undone by attempting to blame Robinson for the improper actions of the prosecutor.
¶ 33. For the foregoing reasons, I believe the appropriate action is to reverse and remand this matter for a new trial.
IRVING, BARNES AND ISHEE, JJ., JOIN THIS OPINION.